# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued February 10, 2016          Decided August 5, 2016

No. 14-5220

JEFFREY LABOW,
APPELLANT

v.

UNITED STATES DEPARTMENT OF JUSTICE,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01256)

---

*Jeffrey Light* argued the cause and filed the briefs for appellant.

*John G. Interrante*, Assistant U.S. Attorney, argued the cause for appellee.  With him on the brief was *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: HENDERSON, ROGERS and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: In 2011, appellant Jeffrey Labow came to learn that he had been identified as an anarchist extremist by an FBI agent. Labow then submitted a request to the FBI under the Freedom of Information Act for any records about himself. Although the FBI released some responsive records to Labow, it withheld disclosure of, or redacted information from, other responsive documents, citing various grounds. The district court upheld the FBI's withholdings and redactions in full, and granted summary judgment in favor of the agency. We agree in some respects and disagree in others. We therefore affirm in part, reverse in part, and remand the case for further proceedings.

I.

Because we are reviewing a grant of summary judgment, "we view the facts in the light most favorable to" Labow. *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1000 (D.C. Cir. 2009). In 2008, anarchists protesting against the World Bank and International Monetary Fund vandalized the Four Seasons hotel in Washington, D.C. The FBI's Joint Terrorism Task Force investigated the incident. One of the targets of the investigation sued the government. In the course of a deposition in connection with that lawsuit, an FBI agent mentioned Jeffrey Labow as another known extremist. The agent refused to answer a question about whether the FBI maintained a file about Labow because answering might reveal information about ongoing law enforcement activities. Based on the agent's answers in the deposition, Labow suspected that the FBI maintained records about him.

Labow then filed a request under the Freedom of Information Act (FOIA) with the FBI, seeking "files, correspondence, or other records concerning [him]self." J.A. 26. The FBI initially claimed that it had no responsive

records. Labow, after exhausting the administrative appeals process, then brought this action in district court. He later amended his complaint to add a request for records about a person named Lawrence Kuhn, another target of the FBI's investigation into the Four Seasons incident.

As Labow's lawsuit progressed, the FBI found several hundred pages of records concerning Labow and more than a thousand pages about Kuhn. The FBI released some of these records to Labow. With regard to other documents, the FBI redacted information from them or refused to release them at all, invoking various statutory exemptions.

The government moved for summary judgment against Labow on his claims seeking disclosure of the withheld documents and redacted information. In his opposition, Labow challenged the government's reliance on FOIA's exemptions, and he also contended that the government had improperly relied on a statutory exclusion from FOIA's coverage. After in camera review of documents submitted ex parte by the government, the district court rejected Labow's arguments and granted the government's summary judgment motion in full. Labow now appeals.

## II.

We review the district court's grant of summary judgment de novo. *Pub. Inv'rs Arbitration Bar Ass'n v. SEC*, 771 F.3d 1, 3 (D.C. Cir. 2014). We first consider the FBI's reliance on various statutory exemptions as the basis for redacting information from responsive documents or withholding their release altogether. Our review calls for "ascertain[ing] whether the agency has sustained its burden of demonstrating that the documents requested are . . . exempt from disclosure." *Id.* (quoting *ACLU v. Dep't of Justice*, 655

F.3d 1, 5 (D.C. Cir. 2011)). We take up, in turn, each FOIA exemption as to which Labow raises a challenge.

## A.

We first consider the FBI's reliance on FOIA Exemption 3 to withhold information associated with a pen register order. A pen register is a device installed on a phone line to enable recording the phone numbers dialed on that line.

Exemption 3, in relevant part, provides that FOIA's disclosure obligation "does not apply to matters that are . . . specifically exempted from disclosure by [another] statute," if the statute "(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," or "(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A). In this case, the FBI withheld certain responsive documents and information about Labow on the rationale that they were "specifically exempted from disclosure by statute," *id.*, i.e., the Pen Register Act, 18 U.S.C. § 3123(d). The district court upheld the FBI's reliance on the Pen Register Act under Exemption 3.

When assessing whether a statute "specifically exempt[s]" matters "from disclosure" for purposes of Exemption 3, 5 U.S.C. § 552(b)(3), we ask two questions: "Does the statute meet Exemption 3's requirements? And does the information that was withheld fall within that statute's coverage?" *Newport Aeronautical Sales v. Dep't of the Air Force*, 684 F.3d 160, 165 (D.C. Cir. 2012). Here, we affirm the district court as to the first question but reverse and remand as to the second.

To address the first question, we look to the terms of the statute invoked by the government—the Pen Register Act. That statute provides:

> An order authorizing or approving the installation and use of a pen register or a trap and trace device shall direct that—
>
> (1) the order be sealed until otherwise ordered by the court; and
>
> (2) the person owning or leasing the line or other facility to which the pen register or a trap and trace device is attached, or applied, or who is obligated by the order to provide assistance to the applicant, not disclose the existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber, or to any other person, unless or until otherwise ordered by the court.

18 U.S.C. § 3123(d).

That statute fits within Exemption 3 if, as noted, it either "(i) requires that . . . matters be withheld from the public in such a manner as to leave no discretion on the issue" or "(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A)(i)-(ii). Because the Pen Register Act satisfies the latter test, we need not consider the former. The statute identifies "particular types of matters to be withheld," 5 U.S.C. § 552(b)(3)(A)(ii), in that it requires the sealing of "[a]n order authorizing or approving the installation and use of a pen register or a trap and trace device," 18 U.S.C. § 3123(d). That description is at least as specific as other

statutes which we have held adequately specify "matters to be withheld" for purposes of Exemption 3.

For instance, we have held that Title III, another electronic surveillance statute, is a qualifying statute under Exemption 3 because it applies to "intercepted communications," a category sufficiently "narrow and well-defined" to implicate the exemption. *Lam Lek Chong v. U.S. Drug Enf't Admin.*, 929 F.2d 729, 733 (D.C. Cir. 1991). We have similarly determined that "proprietary information" under the Tariff Act is a particular matter for purposes of Exemption 3. *Mudge Rose Guthrie Alexander & Ferdon v. ITC*, 846 F.2d 1527, 1529-31 (D.C. Cir. 1988). We reached the same conclusion with regard to information "pertaining to the issuance or refusal of visas" under the Immigration and Nationality Act. *Medina-Hincapie v. Dep't of State*, 700 F.2d 737, 742 (D.C. Cir. 1983). Orders authorizing the installation or use of a pen register likewise "refer[] to particular types of matters to be withheld" within the meaning of Exemption 3. 5 U.S.C. § 552(b)(3)(A)(ii).

Because the Pen Register Act is a qualifying statute under Exemption 3, we next ask whether that statute authorized withholding the particular information at issue in this case. *See Newport Aeronautical Sales*, 684 F.3d at 165. Labow argues that the Pen Register Act permits the government to withhold only a sealed pen register order itself. As a result, he contends, the statute does not justify withholding all information appearing in (or associated with) a sealed pen register order, even if the same information is contained in other responsive records beyond the order. In that event, Labow submits, because the Pen Register Act would not call for sealing the other records, Exemption 3 should not shield those other records from FOIA's disclosure mandate.

As a general matter, we agree with Labow's reading of the Pen Register Act. By its terms, the statute provides for sealing of a pen register order itself, not sealing of any and all information the order may contain even if appearing in other documents. *See* 18 U.S.C. § 3132(d)(1). Although the statute additionally bars disclosures by certain private parties about the existence of a pen register order in the absence of a court order allowing disclosure, *id.* § 3123(d)(2), that limitation does not apply to the government. As a result, Exemption 3 of FOIA, as regards the Pen Register Act, primarily authorizes the government to withhold a responsive pen register order itself, not all information that may be contained in or associated with a pen register order.

To the extent the statute arguably authorizes withholding documents other than a pen register order, we have no occasion to address the issue because we do not know whether this case involves withholding of any records beyond a pen register order. The FBI's chief of records management, David M. Hardy, describes the withheld material as information "surrounding FBI [agents] making arrangements to set up and install a pen register and trap and trace device during a criminal investigation," including the "identities and phone numbers of the individuals subject to pen registers in this case." Hardy Decl. ¶ 73 (J.A. 93). Hardy, however, does not specifically say whether that information was contained in a pen register order itself, and whether, if so, it also appeared in other responsive records.

In these circumstances, we conclude that the district court erred in sustaining the government's reliance on the Pen Register Act based solely on Hardy's declaration. *See Labow v. U.S. Dep't of Justice*, 66 F. Supp. 3d 104, 120 (D.D.C. 2014). We remand for the district court to assess whether the specific information withheld in this case is protected by the

Pen Register Act. If the government withheld information contained exclusively in a pen register order, the information would necessarily fall under the Pen Register Act's nondisclosure requirements and thus would be shielded under Exemption 3 (assuming the pen register order remains sealed). But if the government withheld information found in other responsive documents on the ground that a pen register order also contained the same information, the potential applicability of the Pen Register Statute (and hence of Exemption 3) would be far less clear. As it currently stands, we do not know whether this case involves the latter situation, or, if so, whether there may be some justification for withholding the information beyond the mere fact that it also appears in a pen register order.

## B.

Labow next challenges the government's withholding of records subpoenaed by a grand jury, also under Exemption 3. This court has already held that Federal Rule of Criminal Procedure 6(e) is a qualifying statute under Exemption 3. *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 868 (D.C. Cir. 1981). Consequently, the sole question before us is whether the documents withheld from disclosure fall within Rule 6(e).

Rule 6(e) bars disclosure of "matter[s] occurring before a grand jury." Fed. R. Crim. P. 6(e). In this case, the government withheld "copies of specific records provided to a federal grand jury in response to federal grand jury subpoenas" because they "could reveal the inner workings of a federal grand jury." Hardy Decl. ¶ 74 (J.A. 94). The district court found the withholding permissible because releasing the documents would "reveal the strategy or direction of the investigation." *Labow*, 66 F. Supp. 3d at 121 (alterations

omitted) (quoting *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987)). But the court provided no explanation of why the records would reveal anything about the investigation, and without knowing more, we do not think they necessarily would.

Rule 6(e) does not "draw 'a veil of secrecy . . . over all matters occurring in the world that happen to be investigated by a grand jury.'" *Senate of P.R.*, 823 F.2d at 582 (quoting *SEC v. Dresser Indus. Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980) (en banc)). Instead, the "touchstone" is whether the information sought would reveal something about the grand jury's identity, investigation, or deliberation. *Id.* The mere fact that information has been presented to the grand jury does not itself permit withholding. *Id.* at 584.

The government argues that documents subpoenaed by a grand jury are more revealing than documents merely presented to a grand jury, because they reveal the direction of the grand jury's investigation. If the documents would reveal to the requester that they had been subpoenaed, we would agree. *See Lopez v. Dep't of Justice*, 393 F.3d 1345, 1349-50 (D.C. Cir. 2005) (allowing withholding of grand jury subpoenas). But subpoenaed documents would not necessarily reveal a connection to a grand jury. After all, Labow did not request documents related to a grand jury; he sought documents about particular people. The *government* revealed the existence of a grand jury by withholding documents under Rule 6(e).

It is possible that, had the government released the documents without invoking Exemption 3, Labow would never have known that any of the documents had been subpoenaed by a grand jury. Of course, it is also possible that the documents do somehow reveal that they were subpoenaed

by a grand jury. That might be the case, for instance, if the government's sole copies of the documents were marked as grand jury exhibits, or if documents referenced the grand jury subpoena. On the current record, however, we do not know whether the documents at issue somehow necessarily evince their connection to a grand jury, much less do so in a manner that could not be dealt with through redactions.

The government's declaration only offers the conclusory statement that "[a]ny disclosure of this information would clearly violate the secrecy of the grand jury proceedings and could reveal the inner workings of a federal grand jury." Hardy Decl. ¶ 74 (J.A. 94). The government later clarified that "documents obtained by the FBI independently of a grand jury were not withheld pursuant to Exemption 3," Second Hardy Decl. ¶ 11 (J.A. 132), but we do not know why documents obtained *through* the grand jury's subpoenas would necessarily reveal that connection. As in *Senate of Puerto Rico*, "[i]t may turn out, in this case, that most, or even all, of the material withheld pursuant to exemption (b)(3) cannot be disclosed without compromising the secrecy of a grand jury's deliberations. We hold only that the defendants have not yet supplied the information a court must have in order to intelligently make that judgment." 823 F.2d at 584. The mere fact the documents were subpoenaed fails to justify withholding under Rule 6(e).

We therefore remand for the district court to consider whether the release of the documents subpoenaed by the grand jury would reveal something about the grand jury's investigation. Of course, if the documents are now belatedly released, it might be apparent that they had been subpoenaed by a grand jury given that the potential connection with a grand jury is now known. That fact, however, should not bar disclosure. As we have previously held, the relevant question

is whether the documents would have revealed the inner workings of the grand jury had they been released in response to the initial FOIA request. *See Wash. Post Co. v. U.S. Dep't of Justice*, 863 F.2d 96, 100 (D.C. Cir. 1988). The district court therefore should consider whether the documents would have revealed something about the workings of the grand jury had they been released with other requested documents.

## C.

Labow also contests the FBI's withholding of information provided by confidential informants under Exemption 7(D). That exemption protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to disclose the identity of a confidential source." 5 U.S.C. § 552(b)(7). A source counts as confidential "if the source provided information under an express assurance of confidentiality or in circumstances from which such an assurance could reasonably be inferred." *Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995) (quoting *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993)) (internal quotation marks omitted). The district court permitted withholdings based on both express and implied assurances of confidentiality, *Labow*, 66 F. Supp. 3d at 124-25, but Labow appeals only the withholdings based on implied assurances. At this point, the government has withheld only one page of one document based solely on implied assurances of confidentiality.

"The agency invoking Exception 7(D) bears the burden of proving that it applies, and with respect to the FBI, it is not enough for the agency to claim that all sources providing information in the course of a criminal investigation do so on

a confidential basis." *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1184 (D.C. Cir. 2011). We consider four factors when assessing an implied assurance of confidentiality: "the character of the crime at issue, the source's relation to the crime, whether the source received payment, and whether the source has an ongoing relationship with the law enforcement agency and typically communicates with the agency only at locations and under conditions which assure the contact will not be noticed." *Id.* (quoting *Landano*, 508 U.S. at 179) (internal quotation marks omitted).

In this case, David M. Hardy, who as noted is the FBI's chief of records management, has submitted several declarations describing informants who provided information withheld from Labow. Based on those declarations, we conclude that the four *Roth* factors favor a finding of implied confidentiality for purposes of Exemption 7(D).

The first factor, the character of the crime, contemplates that sources likely expect confidentiality when they report on serious or violent crimes, risking retaliation. *See Landano*, 508 U.S. at 179; *Mays v. Drug Enf't Admin.*, 234 F.3d 1324, 1330 (D.C. Cir. 2000). Hardy's declaration states that "[t]he disclosure of the identities of these sources and the information they provided could have disastrous consequences because disclosure could subject these third parties, as well as their families, to embarrassment, humiliation, and/or physical or mental harm." Hardy Decl. ¶ 96(a) (J.A. 109). He further explains that "sources providing information to the FBI about extremist activities do so at great peril to themselves and have faced retaliation and threats (including death threats) when their assistance to the FBI has been publicly disclosed." *Id.*

Although Labow correctly observes that the withholdings at issue are contained in a document predating the incident at the Four Seasons, Hardy's explanation of the risks of informing on anarchist groups spoke to the potential dangers posed by anarchist extremists in general, not solely by the particular individuals who planned the Four Seasons attack. And while Labow argues that Hardy's explanations are too general and conclusory, we have credited the FBI's assessment of risks faced by informants even if described in relatively broad strokes. In *Hodge v. FBI*, 703 F.3d 575, 581 (D.C. Cir. 2013), for example, an FBI declaration stated that disclosure "could have disastrous consequences" and "subject [informants] to violent reprisals." We found that explanation sufficient, and we do the same here. The government need not provide justifications specific to a particular group of offenders when inferences can reasonably be drawn from the type of crime committed.

The second *Roth* factor calls for considering the source's relationship to the crime, because sources divulging non-public, identifying information are more "vulnerable to retaliation." *Mays*, 234 F.3d at 1330. Here, Hardy's declarations do not claim that the informants directly participated in the crime about which they provided information. But a source of course need not have personally participated in a crime in order to know information about it that could reveal her identity were the information to be released. In this case, Hardy explains, the informants were "in a position to have ready access to and/or knowledge about targets and others involved in extremist activities." Hardy Decl. ¶ 96(a) (J.A 108). And those sources "provided specific detailed information that is singular in nature." *Id.* That describes the kind of information that, if it were revealed to the public, could be traced to a particular source.

With regard to the third *Roth* factor, all parties agree that the sources did not receive payment. That fact weighs against a finding of confidentiality, but it is not itself dispositive.

Finally, the fourth *Roth* factor concerns the duration of the source's relationship with law enforcement and the manner of communication. Consistent and secretive communications indicate a source's expectation of confidentiality. Here, we have no information about the sources' manner of communication. But Hardy's declaration does indicate that the sources provided information "over a period of time that had proven to be reliable." *Id.* That factor thus weighs at least modestly in favor of a finding of confidentiality.

Considering the four factors together, we agree with the district court that they suggest the sources expected confidentiality. Although the sources were not paid, they provided ongoing, singular information about serious crimes. In those circumstances, the district court correctly sustained the FBI's reliance on Exemption 7(D).

D.

Earlier in this appeal, Labow had also challenged a withholding under Exemption 7(A), which exempts "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). The government has now released the documents it initially withheld under Exemption 7(A), Appellee's Br. 17, so that issue is no longer a live one. We will grant Labow's request to vacate the district court's grant of summary judgment to the government with regard to its use of Exemption 7(A). *See Carlisle Tire & Rubber Co. v. U.S. Customs Serv.*, 663 F.2d

210, 213 (D.C. Cir. 1980). Vacatur is appropriate when a party moots an issue it won in a lower court, precluding review on appeal and preserving the lower-court opinion as precedent. *See* 13C Charles Alan Wright et al., *Federal Practice and Procedure* § 3533.10.1 (3d ed. 2008). Although district court opinions do not establish binding precedent on other courts, the government has not objected to vacatur here. We thus grant Labow's request.

## III.

Labow's final challenge concerns the government's possible reliance on a FOIA exclusion. *See* 5 U.S.C. § 552(c). Exclusions differ from exemptions in that the government need not affirmatively claim the former. Rather, when an exclusion applies, the government may "treat the records as not subject to the requirements" of FOIA at all, *id.*, and can thus withhold the documents without comment.

Although the government has not publicly invoked an exclusion in this case, Labow suspects that the government withheld records based on the exclusion set forth in 5 U.S.C. § 552(c)(1). That exclusion applies if:

> a request is made which involves access to records described in [Exemption 7(A)] and—
>
> (A) the investigation or proceeding involves a possible violation of criminal law; and
>
> (B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records

> could reasonably be expected to interfere
> with enforcement proceedings

5 U.S.C. § 552(c)(1). Exemption 7(A) in turn, as noted, encompasses records whose production "could reasonably be expected to interfere with enforcement proceedings." *Id.* § 552(b)(7)(A). The two provisions together thus exclude records from FOIA's disclosure mandate if production would interfere with enforcement proceedings and the documents relate to a criminal investigation about which the target is unaware.

In this case, the district court, adhering to standard FBI practice when confronting a challenge to the suspected use of the exclusion at issue here, reviewed an ex parte FBI affidavit in camera to determine whether the exclusion had in fact been applied, and, if so, whether its application was appropriate. *Labow*, 66 F. Supp. 3d at 128; *see ACLU of Mich. v. FBI*, 734 F.3d 460, 470-71 (6th Cir. 2013). In rejecting Labow's challenge to the suspected use of the exclusion, the district court said only that, "if an exclusion was in fact employed, it was, and continues to remain, amply justified." *Labow*, 66 F. Supp. 3d at 128. Labow thus remains unsure of whether the government actually made use of the exclusion to withhold records.

We review the district court's decision to review evidence ex parte for abuse of discretion. *See Lykins v. U.S. Dep't of Justice*, 725 F.2d 1455, 1465 (D.C. Cir. 1984). The specific question is whether the court abused its discretion by relying on in camera review of the ex parte affidavit rather than following an alternative method presented by Labow for addressing a challenge to the government's possible use of a FOIA exclusion. While we have explained that a court should resort to in camera review only in limited circumstances, *see*

*Yeager v. Drug Enf't Admin.*, 678 F.2d 315, 324 (D.C. Cir. 1982), we find no abuse of discretion here.

Under Labow's alternative proposal, the parties would first assume that an exclusion had been applied and would submit public briefs on whether the hypothetical reliance on the exclusion would be appropriate. The district court would then issue a public opinion addressing whether the exclusion, in theory, would be applicable in the circumstances. If the theoretical use of the exclusion were invalid, the court would then review ex parte submissions to determine whether the government in fact made use of the exclusion. In essence, Labow's proposal inverts the approach followed by the district court: instead of initially assessing whether an exclusion in fact was used and then, if so, assessing the permissibility of its use, Labow would first ask whether reliance on the exclusion would be permissible and then, if so, assess whether it in fact was used.

Labow's suggested approach would generally enable a FOIA requester to learn whether the government's use of an exclusion would (at least in theory) be justified in the circumstances. But district courts would be in the business of considering and deciding abstract questions about the theoretical applicability of a FOIA exclusion in circumstances in which the government might have never relied on the exclusion in the first place.

Two courts of appeals have rejected proposals paralleling Labow's. The Sixth Circuit refused to require the same procedure, for reasons including the risks of revealing information during the briefing process. *ACLU of Mich.*, 734 F.3d at 470-72. The more the government turns to hypothetical arguments to avoid revealing any information, the court reasoned, the less productive the adversarial briefing

would be:  "Open-ended hypothetical questions are not well suited to the litigation process."  *Id.* at 472.  And the government would be "tasked with responding to [abstract] shots in the dark" in circumstances in which "fashioning a response is fraught with concerns of accidentally disclosing the existence or nonexistence of secret information." *Id.*  The Third Circuit later came to the same conclusion.  *ACLU of N.J. v. FBI*, 733 F.3d 526, 533-35 (3d Cir. 2013).  Here, the district court did not abuse its discretion in declining to follow a process rejected by those decisions and instead adhering to a practice endorsed by them.

We must finally review de novo whether the district court was wrong in finding no error in the FBI's reliance, if any, on an exclusion in this case.  We, like the district court, have reviewed the government's submissions about the exclusion in camera.  And we, like the district court, will not comment on whether the FBI in fact relied on an exclusion.  Instead, we hold only that no documents have been withheld pursuant to any impermissible use of an exclusion.

\*　　\*　　\*　　\*　　\*

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the government on the claims under Exemption 7(D) and under the exclusion set forth in 5 U.S.C. § 552(c)(1).  We reverse the grant of summary judgment on both challenges to withholdings under Exemption 3 and remand for further proceedings consistent with this opinion.  Finally, we vacate the district court's opinion with regard to Exemption 7(A).

*So ordered.*